GREAT NORTHERN MANUFACTURING COMPANY

*vs.*      .

GEORGE BROWN.

Knox.    Opinion February 12, 1915.

*Circulars.   Contract.   Delivery.   Fraud.   Misrepresentation.   Sale.*

1.   There is no controversy that defendant executed the contract upon which the suit is brought, and by the ordinary rules of law is presumed to know its contents, whether read or not.

2.   But if it is shown that the contract, itself, was procured by fraud, the general rule does not apply.   If it did, no written instrument could be avoided.   It is universally held that the most sacred instrument may be avoided for fraud.

3.   The means which may be employed to accomplish a fraud are as varied as the ingenuity of the human mind, and upon the question as to whether a fraud was intended and the means employed calculated to accomplish it, it is no exaggeration to say, that it would be a rare discovery to find a device better designed to establish fraudulent intent than the scheme conceived and operated in this case.

On exceptions by plaintiff.   Exceptions overruled.

This is an action on a special contract for goods sold and delivered. The defendant plead the general issue and filed, in addition thereto, a

·brief statement alleging misrepresentation and fraud in procuring the contract. At the conclusion of the evidence, the presiding Justice directed a verdict for the plaintiff for $15.00 and the plaintiff excepted.

The case is stated in the opinion.

*A. S. Littlefield*, for plaintiff.

*Alan L. Bird*, for defendant.

SITTING: SPEAR, KING, BIRD, HANSON, JJ.

SPEAR, J. This is an action upon a special contract alleging "that the defendant at Port Clyde, to wit at Rockland, on the 24th day of October, A. D. 1911, entered into a written contract by him signed, wherein the plaintiff agreed to sell and the defendant to buy 12 Harmony Disc Talking Machines with horns complete, the plaintiff to furnish free therewith 100 needles and 27 double disc 10 inch harmony records to be free therewith.

"And the parties to said contract did agree that said machines should be delivered by the plaintiff and received by the defendant on board the cars at Bridgeport, Connecticut; and the defendant did agree to pay for the same the sum of $17.55 for each of said machines within thirty days from the time said machines were so shipped."

The machines were delivered according to the agreement and transported to Port Clyde and tendered by the carrier to the defendant. But the defendant refused to accept the machines on the ground that the contract of sale to him was procured by fraud. In answer to the plaintiff's action he pleaded the general issue and a brief statement setting up misrepresentation and fraud in procuring the contract. The account annexed was for twelve machines at $17.55 each, amounting to $210.60, and needles amounting to $7.00, making a total of $217.60 and interest amounting to $22.50.

At the conclusion of the testimony, the court directed a verdict for the plaintiff for $15.00, being the amount of freight from Connecticut to Port Clyde and return, which was a ruling in favor of the defendant upon the question of rescission. The plaintiff excepted to the instruction, but inasmuch as the instruction was in favor of the plaintiff to the amount of the verdict, the conclusion of the presiding justice,—that in order to effectuate the rescission the defendant was required to pay the freight—being erroneous, the instruction was harmless error except to the defendant who does not complain.

There is no controversy that the defendant executed the contract upon which the suit was brought. The defense is rescission based upon misrepresentation and fraud; the issue, are they proved?

We do not overlook the fact that the defendant signed a written contract and, by the ordinary rules of law, is presumed to know its contents, whether read or not. But if shown that the contract, itself, was procured by fraud, the general rule does not apply. If it did, no written instrument could be avoided. But it is universally held that the most sacred instrument may be avoided for fraud. Accordingly, the question to determine, is not whether the contract was signed and entitled to the ordinary force of such an instrument, but whether it is entitled to any force as the contract of the defendant. "Fraud has been defined to be any cunning, deception or artifice used to circumvent, cheat or deceive another. Words and Phrases, Vol. 3, 2943."

The means which may be employed to accomplish a fraud are as varied as the ingenuity of the human mind. But whatever the method, we inquire first, in proof, Was a fraud intended? Second, were the means employed calculated to accomplish it? Third, was the intended victim entrapped? It is not exaggeration to say, that it would be a rare discovery to find a device better designed to establish fraudulent intent, and fraudulent methods, than the scheme conceived and operated in this case. The plan was to thoroughly prepare the mind of the victim to expect the reverse of what he was to receive; to fix his attention upon a gift and divert it from a sale; to gain his confidence and allay suspicion; to misrepresent and avoid detection; to get his signature without inspection. When the way was prepared for the sacrifice, a priest appeared at the temple, and the omens augured success.

While the circulars which the defendant received were not in his possession at the time of the trial, other circulars, identical with the ones which he had received, were offered in evidence and properly admitted. The first step, in the accomplishment of the scheme, is shown by a letter headed Harmony Talking Machine Co., 600 to 630 South Dearborn St., Chicago, 2-1-12. While not addressed to the defendant, it was precisely like the one he received, and is partly as follows: "Dear Sir: We simply want to send you one sample machine and a good selection of a few of our best Harmony velvet tone records—we'll send this sample outfit at our own expense—

there'll be no charge whatever. We want you to examine the instrument—listen to our sweet toned records, and then let us know how many of these machines you can give away for us in your locality. Yes, we want the machines given away absolutely free—don't want you to charge one red cent for the instrument—it wont cost you anything and we don't want you to charge for it. This is simply an advertising idea to sell Harmony Velvet Toned Records." Now it will be observed that the language of this letter is calculated to impress upon the mind of the prospective donee the sole idea that he is to receive these machines free of any charge. For instance, in the sentence, "Don't want you to charge one red cent for the instrument," the phrase "one red cent" attracts the eye, and negatives the idea of pay. They then go on to state the reason why they are able to give these machines away—that it is simply an advertising scheme to sell the Harmony Velvet Tone Records; that with every machine they are placed in a position to sell from 75 to 100 records upon which they are able to make large profits, "so that it can be easily seen why we are glad to give them away free." Then as a further inducement they say that many stores make everybody buy $30.00 or $35.00 worth of merchandise before giving them a machine, which is calculated to draw trade from the other merchants. They then wind up with the injunction, "Please do not delay sending for the free sample outfit. We want to begin giving the machines away as soon as possible. Yours very truly, Harmony Talking Machine Co."

Comment is unnecessary. The meaning of this letter is clear to a layman.

The first circular evidently was not answered. From the phraseology of the second circular it would seem that a failure to answer the first was regarded but an opportunity on the part of the plaintiff to make more enticing the lure of the scheme. This circular begins: "Dear Sir: You did not answer our last letter—why? Either the letter didn't get to you— or you didn't understand us clearly or you certainly would have written us. We want to know whether you will give away a certain number of our talking machines to your customers—give them away free? The machine, itself, don't cost you or your customers anything—what we want to do is to sell records to the people that you give these machines to. Our machine is built in such a way that no record but the Harmony can be played on this instrument. Our proposition to you is this: let us send you

twenty-five or fifty machines—put these in your window and we'll furnish you a couple of window sign card that read: "THESE TALKING MACHINES WILL BE GIVEN AWAY FREE WITH TWENTY-FIVE DOLLARS IN TRADE." The capital letters appear in the circular, thus making conspicuous the theory of gift. Constantly keeping in view the bait, the next paragraph goes on to say, "Then give away one instrument to each family on that plan." Then a reference is made to the profits to be gained by the sale of the records. Further along the fact that the machine is free is again brought to the attention of the prospective recipient: "And we also know that a person that gets a machine free always buys a great many more records than people do, that had to pay $20.00 or $25.00 for the instrument." The next paragraph emphasizes the idea of a gift by stating: "The machine you give away is a regular $25.00 instrument," etc. Then the very last thing to which attention is called is as follows: "Remember this sample outfit is free also—it is sent at our expense—no express charges or in fact any charge at all—Simply mail the post card for this outfit." This is signed precisely as the other circular.

From these communications it is too obvious for question that the foreground, the background and the detail of the picture contained in these circulars, all end in the perspective of free machines, to whoever would consent to take them for distribution to customers.

The defendant answered this circular, in response to which, according to the representation, he should have received "a free sample outfit." But the free sample outfit was but an optical illusion. It was not in harmony with the original design. It would not accomplish the end which the inventors of the scheme had in view. It would not secure a contract for the purchase of these machines at $17.55 each. Accordingly, to carry out the plan and secure the contract it became necessary to send an agent ostensibly representing another company, called the "Great Northern Manufacturing Co." The real mission of the new company in the mechanism of the plan is not obvious unless to prevent the admission of the circulars on the ground that the contract was not made with the company sending out the circulars. But this point is not made in argument before the Law Court, nor could it be, inasmuch as the agent purporting to represent the Great Northern Manufacturing Co. had no mission except to represent the Harmony Talking Machine Co.

Having prepared the mind of the defendant for free machines, the agent appeared before him with the post card, in hand, sent to the defendant and, by him, signed and returned for the order. In accord with the circulars intended to deceive were the representations made by the agent. At the outset when the defendant's wife objected to taking the machines, he said: "These machines are not going to cost Mr. Brown anything." Then later when the defendant signed the contract the agent said: "You will have to sign these papers, or paper, to show you are going to receive these machines." He did not say "buy these machines." The language was in direct harmony with the scheme. The word "receive" carried out the idea of gift, with which the defendant's mind had been filled. The defendant's wife also testified that the agent said to the defendant: "They are not going to cost Mr. Brown anything." His daughter testified that her mother refused to have a machine in the house; that her father replied he thought she would be all right when she understood about them, and that the agent then explained that they were going to cost Mr. Brown nothing. Again she states that the agent said that there would be a profit on the needles and the records were to sell; the machines were to be free. Not a word of this testimony was contradicted. It, therefore, appears that this agent several times, and whenever he said anything at all about the disposal of the machines, reiterated precisely what was in both the circulars, either that the machines would cost Mr. Brown nothing or that they would be free. Upon the strength of these circulars and the representations of the agent, the defendant signed the contract which he says he supposed, as the agent told him, was simply a writing indicating his consent to receive the machines to be disposed of in accordance with the representations made in both the circulars and by the agent, when, as a matter of fact, he signed a contract for the purchase of twelve of these machines at $17.55 each. And the climax of the fraudulent intent of the whole transaction is found in the last paragraph of the contract signed by the defendant, namely: "It is fully understood between the parties hereto that this instrument covers and includes all contracts and agreements between the parties hereunder."—a confession and attempted avoidance of a barefaced fraud. In confirmation of the interpretation given to the circulars sent to the defendant, it is not without interest to note that the word "free," "without" charge," "don't cost anything," or the exact equivalent, is used fifteen

times in the first circular and fifteen times in the second circular. The correspondence of the numbers in each circular may be a coincidence but the repeated use of the phraseology was undoubtedly employed with crafty design.

*Exceptions overruled.*